254

Caleb S. Layton (of Richards, Layton & Finger), of Wilmington, Del., for Celotex Co., receivers and trustees.

William H. Foulk (of Satterthwaite & Foulk), of Wilmington, Del., and A. Allan Simon, John C. Bell, Jr., and Leo Sutton, all of Philadelphia, Pa., for Jacob Mazer.

NIELDS, District Judge.

Claim by licensor against assignee of licensee for additional royalties under license agreement.

January 14, 1925, Jacob Mazer, licensor, granted to Dahlberg & Co., Inc., licensee, the right to practice the inventions of certain letters patent granted to Mazer for improvements in sound absorbing method and material. The Celotex Company was the operating company of licensee. In 1930 licensee transferred all its rights under the license agreement to the Celotex Company. June 26, 1932, equity receivers were appointed by this court for the Celotex Company. February 8, 1935, trustees were appointed by this court for the Celotex Company in reorganiza-

tion proceedings under section 77B of the Bankruptcy Act (11 U.S.C.A. § 207). Throughout this opinion Celotex Company shall comprehend Dahlberg & Co., Inc., the Celotex Company, the receivers and the trustees.

This controversy turns on the construction of royalty clauses in the license agreement. Mazer was the patentee and owner of four United States letters patent:

| No. | Issued | For |
| --- | --- | --- |
| 1,172,379 | Feby. 22, 1916 | Improvements in Acoustic Controlling Apparatus. |
| 1,318,574 | Oct. 14, 1919 | Improvement in an Acoustic Element. |
| 1,483,365 | Feby. 12, 1924 | Improvement in Sound-Absorbing Method and Material. |
| 1,483,366 | Feby. 12, 1924 | Improvement in Sound-Absorbing Method and Material. |

The two patents first above recited are referred to as the "earlier patents" and the two others as the "later patents." The "earlier patents" included in the license agreement were never used by Celotex Company. They are not involved in this proceeding. Petitioner's claim is restricted to royalties upon the sale of materials manufactured and sold by Celotex Company under the "later patents."

Section 2 of the license agreement provides:

"2. The company agrees to pay to Mr. Mazer the following royalties:

"During the residue of the terms of the later patents, the following percentages of the amount of the selling price of materials manufactured and sold by the company under said later patents:—

"3% up to the first $1,000,000

"2% up to the second $1,000,000

"1½% on all amounts in excess of $2,000,000 * * *

"[Last clause] If the company shall make the sales * * * upon which the above percentages are based to a subsidiary, associated or affiliated company, or through any agency or sub-licensee, then the said selling price * * * shall be that charged to the consumer, or customer, by the company's subsidiary, associated or affiliated company or agency or sub-licensee."

A brief recital of events will be helpful. For many years Celotex Company had been engaged in the manufacture of insulating board and other products in the state of Louisiana. In the growth of the

business various products were manufactured through departments. Early in 1924 Celotex Company began the manufacture of acoustical products. In this line of business it was necessary to carefully select the purchasers, as skill was required in handling the product. To that end Celotex Company adopted and put into effect a plan of marketing this product through competent contractors in assigned territory. The characteristics of the product occasioned this merchandising system. The contractors came to be designated as "approved" or "authorized" contractors in such territory. This plan of marketing avoided direct sales to general contractors, builders, or purchasers except certain large users whose practice was to buy directly from manufacturers. This merchandising system had been adopted before the license agreement was entered into.

In November, 1924, Mazer was approached by a representative of Dahlberg & Co., Inc., respecting the granting of a license under the patents. In December, 1924, Mazer met Dahlberg at the latter's office in Chicago. A license agreement with royalty payments was discussed. There was further discussion between Dahlberg and Mazer about the middle of December, 1924. A percentage royalty with graded reductions as sales grew in volume was considered. Thereafter Mazer, with his attorney Trinkle, went from Philadelphia to Chicago and met Dahlberg and Lutkin, attorney for Celotex Company. December 29, 1924, Mazer, Trinkle, and Lutkin met in Lutkin's office in Chicago to draft a license agreement. The first royalty clause was agreed upon without much difficulty. It relates to royalty under the later patents based on the selling price of material manufactured and sold by the company. The last clause of section 2 recited above involved considerable discussion. Lutkin testified:

"Following the talk about the relationship between Dahlberg and The Celotex Company, in the next draft of the contract the words 'associated and affiliated companies' were added to cover the relationship between The Celotex Company and Dahlberg & Company. Then Mr. Trinkle and Mr. Mazer discussed with me whether those words were sufficient to take in some sales company or selling agency thru which The Celotex Company might market the product. They asked me to put in the words 'agency and sub-licen-

see' and I said I had no objection to putting in the words 'sub-licensee' because that is what The Celotex Company was— that was the relationship between The Celotex Company and Dahlberg & Company, and the contract should cover that or any other similar relationship. My memory is that I objected to putting in the word 'agency' and I think I talked with Mr. Dahlberg about that on the telephone in their presence. They said to me that the royalties were to be based on the actual sale price received as to the later patents and the actual installation price under the earlier patents and I agreed that they were entitled to protection in the event that The Celotex Company, thru some other instrumentality, did the selling or did the installing where The Celotex Company participated in the profits, or, in other words, language that would prevent any evasions by The Celotex Company, and the words were added 'thru any agency or sub-licensee.'"

Before entering into the license agreement, Mazer knew of the merchandising system and knew that it had been adopted and was being carried out by Celotex Company. Dahlberg testified:

"Q. And what was your discussion with Mr. Mazer concerning the approved contractors, as you recall it? A. That we were restricting our sales of acoustical material to contractors competent to install that material. That we had a fixed price applicable all over the United States alike to everybody. That so far as acoustical material was concerned we would restrict that fixed price or any price to these acoustical contractors, and that we would not make it the practice of selling to anybody but approved contractors as might be established from time to time.

"Q. Was anything said either by you or by Mr. Mazer as to the basis on which the royalty should be fixed on the sales to approved contractors? A. Yes.

"Q. What was said? A. The price would be the Celotex price to the approved contractors.

"Q. Did Mr. Mazer at any time suggest to you or take up with you the matter of fixing the royalty on the installed price of the approved contractors? A. No, sir; it was never discussed between us."

Mazer himself testified:

"Q. Mr. Mazer, you knew at the time this contract was being negotiated that The Celotex Company sold this product

to authorized contractors, didn't you? A. Yes.

"Q. Did you not know that those authorized contractors paid The Celotex Company their regular price for the product? A. Yes.

"Q. And you knew also, did you not, that The Celotex Company didn't participate in the price to the customer thru the authorized contractor? A. It was not intended that they should participate, so far as I knew."

The draft of license agreement was completed December 30, 1924. Later Lutkin had it retyped and copies were mailed to Trinkle in Philadelphia. The agreement was brought back to Chicago by Mazer, and after some minor changes was signed January 14, 1925.

In January, 1925, just before the execution of the license agreement, Mazer entered the employ of Celotex Company as acoustical department manager. Due to the newness of the business, Celotex Company had not full opportunity to establish suitable authorized contractors in some sections of the country and in those sections often sold acousti-celotex either to lumber dealers or to general contractors who had a contract to erect a building. As this merchandising policy became better established, written agreements were made with approved contractors. The earliest written contract in evidence is dated August 5, 1925, and is in the form of a letter from Celotex Company to Wallace & Gale Company, Baltimore, Md., stating:

"For your consideration and discussion with our Mr. Mazer and Mr. Collins, we will sum up here, the proposition to you to act as approved Acousti-Celotex contractors as covered in your conversation of yesterday with our Mr. Collins. We will assign to you as your territory—in the State of Maryland, the counties of. * * * In the State of Delaware, the counties of Kent and Sussex. We will refer all business in the territory mentioned to you as well as business in the adjacent territory where we are not yet represented by approved Acousti-Celotex contractors.

"Here are our prices to you as an approved Acousti-Celotex contractor: * * *

"Our prices to those other than approved Acousti-Celotex contractors, * * * are 6 cents per square foot higher than the above. This is a substantial differential designed for your protection.

"We will broadcast the information that the Wallace & Gale Company are our approved Acousti-Celotex contractors in the above prescribed territory and all inquiries that develop in this territory and analyses that are made for it will be referred to you for your follow-up and so that you can place bids. * * * Backing up this organization is Mr. Jacob Mazer, who is in charge of the Eastern department of the acoustical division of this company. * * *"

A convention of approved contractors held in Chicago in January, 1927, voiced a protest against the differential referred to in the above letter as inadequate, whereupon Celotex Company increased the differential to 15 cents. However, this differential was abandoned by Celotex Company in a bulletin dated April 16, 1927, where it was said: "These arrangements are rescinded in order to establish even more strongly our fundamental policy of selling Acousti-Celotex only through approved contractors."

Mazer contends that the words "any agency or sub-licensee" in the last clause of section 2 of the license agreement include and comprehend "approved acousti-celotex contractor," "authorized contractor," "contracting engineer," or "the contractor," and therefore, on all installations of acousti-celotex by this class of purchasers, the royalties due him are to be calculated on the price received by the approved contractors from the ultimate user of the product. On the other hand, Celotex Company takes the position that approved contractors are purchasers of the product from the manufacturer, and any royalties due Mazer should be calculated on the price paid by such contractors to Celotex Company for the material. In all of these contracts the approved or authorized contractor is designated "contracting engineer," "the contractor," "approved acousti-celotex contractor," or "authorized contractor." In no one of these contracts is such contractor designated as "agent or sub-licensee." As a matter of fact, Celotex Company never shared either directly or indirectly in the selling price of materials sold by approved contractors. If it were intended to include these "approved contractors" within the license agreement, it would have been sim-

ple and easy to have said so. If such had been the intention of the parties, the license contract doubtless would have provided: That, if any sales shall be made by the company to a subsidiary, associated, or affiliated company, or through any approved acousti-celotex contractor or approved celotex contracting engineer or through any similar instrumentality performing similar functions and duties, by whatever name it may hereafter be known, then the royalties shall be based upon the selling price of such engineer or contractor to his customer.

The able and skillful lawyers engaged in drafting this license agreement would have used such terms or substantially equivalent language if such had been the intention of the parties. The accepted practice of marketing through approved contractors was well known at the time of negotiating the license to both licensor and licensee. If "the selling price of materials sold" by the approved contractors had been intended, it would certainly have been plainly expressed in the license.

Interpreting the license from another angle, the word "agency" does not properly define these approved contractors.

"Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement of the Law of Agency, § 1.

The word "agency" is to be given its legal meaning, unless it is clearly used in a different sense. If the word "agency" is given the construction contended for by the petitioner, it will do violence both to the legal meaning of the word "agency" and to the context in which the word is used. "Approved contractors" are in no sense synonymous with a subsidiary, associated, or affiliated company nor are they in any sense agents of Celotex Company.

In normal practice royalties are computed from the books of the licensee. These books would necessarily reflect the prices paid by the approved contractors. The prices paid to the approved contractors by the ultimate users are beyond the knowledge of the licensee and could not have been intended as the basis of royalties.

An order in accordance with this opinion may be submitted.